DAVID B. GOLUBCHIK (State Bar No. 185520)
J.P. FRITZ (State Bar No. 245240)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: dbg@lnbrb.com; jpf@lnbrb.com

Proposed Attorneys for Chapter 11
Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re: | ) Case No.: LA 10-14897-ER |
| | ) |
| | ) Chapter 11 Case |
| CEDROS PROPERTIES, LLC, | ) |
| | ) **DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF MOUSSA KASHANI IN SUPPORT THEREOF** |
| Debtor and Debtor in Possession, | ) |
| | ) |
| | ) |
| | ) |
| | ) Hearing: |
| | ) Date: May 3, 2010 |
| | ) Time: 10:00 a.m. |
| | ) Ctrm: 255 East Temple Street |
| | ) Courtroom 1568 |
| | ) Los Angeles, CA 90012 |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

1

## SUMMARY

Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, 11 U.S.C. §§ 363(c), and Rules 4001 and 9014 of the *Federal Rules of Bankruptcy Procedure* (THE "Bankruptcy Rules"), Cedros Properties, LLC (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case, hereby moves, on an emergency basis (the "Motion"), for entry of an order authorizing the Debtor to use cash collateral on an emergency interim basis pending a final hearing in accordance with the Debtor's operating budget (the "Budget"), a copy of which is attached as Exhibit "A" to the annexed Declaration of Moussa Kashani (the "Kashani Declaration").

**PLEASE TAKE NOTICE** that the above-referenced case has been reassigned to the Honorable Ernest Robles, United States Bankruptcy Judge, in the Courtroom referenced on the first page hereto.

**PLEASE TAKE FURTHER NOTICE** Bankruptcy Court scheduled a hearing on the Motion for Monday, May 3, 2010 at 10:00 a.m.

The Debtor's primary asset is a 22-unit apartment building (the "Property") located in Panorama City, California.  The Debtor acquired the Property in 2003 for approximately $1,325,000.00 with a promissory note in favor of an entity known as Impact.  In 2007, the promissory note and relevant documents were assigned to Zion Bank.  In 2010, Zion Bank purportedly sold and assigned the promissory note on the Property to Asset Management West 14, LLC ("AMW").  The total secured debt on the Property owed to AMW is approximately $1,550,000.00.  There is a secured mechanic's lien in favor of Pezeshk Electric ("Pezeshk") on the Property in the amount $7,788.00.  The Debtor believes that the Property's value is $1,900,000.00.  Currently, the Property has a certificate of occupancy for eighteen (18) units, and the Debtor is in the process of acquiring a certificate for the full 22 units from municipal agencies with a hearing and an appeal on the issues pending.

For several months the Debtor has been back and forth with the Los Angeles Housing Department, the Los Angeles Department of Building and Safety, and other municipal agencies ("Bureaucracies") regarding regulatory compliance in pursuit of obtaining a certificate of

1   occupancy for the full 22 units in the Property.  Government cutbacks and a pattern of disjointed,

2   bureaucratic, piecemeal citations have stymied the Debtor's efforts and progress in obtaining the

3   certificate.  Typically, Bureaucracies cite the Debtor for a code violation, the Debtor fixes it, then

4   Bureaucracies inspect the Property and cite a new violation.  Each time a violation is cited, the

5   Debtor has addressed it and brought the Property into compliance, and each time Bureaucracies

6   cite another violation that they did not cite before.  This pattern of disjointed citation has delayed

7   the Debtor for months in acquiring the certificate.  The delay has been exasperated further by the

8   municipal budget cutbacks, resulting in less employees to process claims and longer waits on

9   hearings and appeals, like those currently pending for the Debtor.

10   The ultimate effect of this delay has been a reduction of the Debtor's earning income

11   relative to full occupancy of the Property and generating rental income.  Without the certificate

12   of occupancy, the Debtor can rent only eighteen (18) of its 22 units.  Currently, the Debtor is

13   renting approximately sixteen (16) units, for an occupancy rate of 73%.  With lowered

14   occupancy rates, the Debtor was unable to make its monthly loan payments to Zion Bank at

15   approximately $10,000.00 per month, inclusive of principal, interest, and impounded taxes.  The

16   Debtor sought a modification of the loan with Zion Bank until it could obtain the certificate of

17   occupancy for the remaining four (4) units, but Zion Bank would not negotiate.

18   In January 2010, Zion Bank filed a notice of default on the Property.  A foreclosure sale

19   would be scheduled for May 2010.  On April 27, 2010, AMW, as the purported assignee of the

20   Zion Bank note, gave notice to the Debtor's proposed bankruptcy counsel that AMW would

21   make an *ex parte* motion for appointment of a state court receiver at 8:30 a.m. on April 28, 2010.

22   AMW made it clear that it was not interested in a resolution but only foreclosure of the Property.

23   The Debtor determined that the instant filing was necessary and proper to preserve the value of

24   the Property.

25   Pursuant to the Motion, the Debtor seeks Court authority to use cash collateral in order to

26   pay the expenses of maintaining and operating the Property, as set forth in the Budget.  The Budget

27   reflects the Debtor's ordinary and necessary operating expenses that must be paid postpetition to

28   preserve the Debtor's business.  While the Budget represents the Debtor's best estimate of such

expenses, the needs of the business may fluctuate. Thus, the Debtor seeks authority to deviate from the total expenses contained in the Budget by no more than 15%, on a cumulative basis, and to deviate by category (provided the Debtor does not pay expenses outside any of the categories) without the need for further Court order.

The Debtor submits that AMW is adequately protected by the use of cash collateral. AMW is protected by an equity cushion of approximately 22.6%. Similarly, Pezeshk is protected by an equity cushion of approximately 21.9% (Debtor understands that Pezeshik consents to use of cash collateral). In addition, AMW and Pezeshik (collectively,. the "Secured Creditors") will be adequately protected by the continuing management and operation of the Property, thereby preserving the value of their collateral.

On the other hand, if the Debtor is not permitted to use its cash collateral to maintain and operate the Property, it is all but certain that the Debtor's existing tenants will leave, taking with them all of the revenue that the Debtor is currently generating. Furthermore, the Debtor's inability to use cash collateral to operate the Property will make it virtually impossible for the Debtor to enter into any new leases with prospective tenants, thereby foreclosing on the Debtor's ability to generate additional revenue.

## **ADDITIONAL INFORMATION**

This Motion is based upon Local Bankruptcy Rules 2081-1(a)(9), 4001-2, and 9075-1, 11 U.S.C. § 363(c) and Bankruptcy Rules 4001 and 9014, the supporting Memorandum of Points and Authorities and Kashani Declaration attached hereto, the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court. The Debtor submits that the setting of the hearing on this Motion on an emergency basis is warranted given the critical need to fund operations of an active apartment building.

Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), while the Court cannot conduct a final hearing on this Motion earlier than 15 days after service of this Motion, the Court may conduct a preliminary hearing before such 15-day period expires to enable the Debtor to use cash collateral and obtain post-petition financing as is necessary to avoid immediate and irreparable

1    harm to the Debtor's estate pending a final hearing.  For the reasons noted herein and in the

2    accompanying Memorandum of Points and Authorities, the Debtor must be able to pay expenses

3    in accordance with the Budget pending a final hearing in order to avoid immediate and

4    irreparable harm to the Debtor's business and its bankruptcy estate.

5         In order to provide maximum notice of this Motion, concurrently with the filing of this

6    Motion with the Court, the Debtor has served a copy of this Motion and all supportive papers

7    upon the Office of the United States Trustee, the Secured Creditor, 20 largest unsecured

8    creditors, and parties requesting special notice (if any) via overnight mail.

9         As set forth in detail in the accompanying Memorandum of Points and Authorities, the

10   proposed use of cash collateral does not include any of the provisions set forth in Bankruptcy

11   Rule 4001(c)(1)(B)(i) – (xi) or Local Bankruptcy Rule 4001-2(b).

12        **WHEREFORE**, the Debtor respectfully requests that this Court hold a hearing on the

13   Motion and enter an order:

14        (1)    affirming the adequacy of the Notice given herein;

15        (2)    granting the Motion on an interim basis pending a final hearing thereon;

16        (3)    authorizing the Debtor to use cash collateral to pay all of the expenses set forth in

17   the Budget, with authority to deviate from the line items contained in the Budget by not more

18   than 15%, on both a line item and aggregate basis;

19        (4)    setting a final hearing on the Motion; and

20        (5)    granting such other and further relief as the Court deems just and proper under the

21   circumstances.

22   Dated: April 28, 2010                    CEDROS PROPERTIES, LLC

23

24                                           By:___ */s/ David B. Golubchik*____
                                                  DAVID B. GOLUBCHIK
25                                                JOHN-PATRICK M. FRITZ
                                                  LEVENE, NEALE, BENDER, RANKIN
26                                                 & BRILL L.L.P.
                                                  Proposed Attorneys for Chapter 11
27                                                Debtor and Debtor in Possession

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

1.      Cedros Properties, LLC, (the "Debtor") debtor and debtor in possession herein, commenced this case by filing a voluntary petition under chapter 11 of title 11 of the United States Code, sections 101 *et seq.* (the "Bankruptcy Code") on April 27, 2010.  The Debtor continues to operate its business and manage its financial affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

**A.      Background**

2.      The Debtor's primary asset is a 22-unit apartment building (the "Property") located in Panorama City, California.   The Debtor acquired the Property in 2003 for approximately $1,325,000.00 with a promissory note in favor of an entity known as Impact.  In 2007, the promissory note and relevant documents were assigned to Zion Bank.  In 2010, Zion Bank purportedly sold and assigned the promissory note on the Property to Asset Management West 14, LLC ("AMW").    The total secured debt on the Property owed to AMW is approximately $1,550,000.00.  There is a secured mechanic's lien in favor of Pezeshk Electric ("Pezeshk") on the Property in the amount $7,788.00.  The Debtor believes that the Property's value is $1,900,000.00.  Currently, the Property has a certificate of occupancy for eighteen (18) units, and the Debtor is in the process of acquiring a certificate for the full 22 units from municipal agencies with a hearing pending.

3.      For several months the Debtor has been back and forth with the Los Angeles Housing Department and other municipal agencies ("Bureaucracies") regarding regulatory compliance in pursuit of obtaining a certificate of occupancy for the full 22 units in the Property. Government cutbacks and a pattern of disjointed, bureaucratic, piecemeal citations have stymied the Debtor's efforts and progress in obtaining the certificate.  Typically, Bureaucracies cite the Debtor for a code violation, the Debtor fixes it, then Bureaucracies inspect the Property and cite

1   a new violation.  Each time a violation is cited, the Debtor has addressed it and brought the

2   Property into compliance, and each time Bureaucracies cite another violation that they did not

3   cite before.  This pattern of disjointed citation has delayed the Debtor for months in acquiring the

4   certificate.  The delay has been exasperated further by the municipal budget cutbacks, resulting

5   in less employees to process claims and longer waits on hearings and appeals, like those

6   currently pending for the Debtor.

7       4.    The ultimate effect of this delay has been a reduction of the Debtor's earning

8   income relative to full occupancy of the Property and generating rental income.  Without the

9   certificate of occupancy, the Debtor can rent only eighteen (18) of its 22 units.  Currently, the

10  Debtor is renting approximately sixteen (16) units, for an occupancy rate of 73%.  With lowered

11  occupancy rates, the Debtor was unable to make its monthly loan payments to Zion Bank at

12  approximately $10,000.00 per month, inclusive of principal, interest, and impounded taxes.  The

13  Debtor sought a modification of the loan with Zion Bank until it could obtain the certificate of

14  occupancy for the remaining four (4) units, but Zion Bank would not negotiate.

15      5.    In January 2010, Zion Bank filed a notice of default on the Property.  A

16  foreclosure sale would be scheduled for May 2010.  On April 27, 2010, AMW, as the assignee of

17  the Zion Bank note, gave notice to the Debtor's proposed bankruptcy counsel that AMW would

18  make an *ex parte* motion for appointment of a state court receiver at 8:30 a.m. on April 28, 2010.

19  AMW made it clear that it was not interested in a resolution but only foreclosure of the Property.

20  The Debtor determined that the instant filing was necessary and proper to preserve the value of

21  the Property.

22  **B.    Need For Use of Cash Collateral**

23      6.    Pursuant to the Motion, the Debtor seeks Court authority to use cash collateral in

24  order to pay the expenses of maintaining and operating the Property, as set forth in the Budget

25  attached hereto as Exhibit "A".  The Budget reflects the Debtor's ordinary and necessary operating

26  expenses that must be paid postpetition to preserve the Debtor's business.  Additionally, the

27  Budget contains a line item for "Capital Expenditures," which are expenditures necessary to

28

1 rehabilitate vacant units to rent them out to new tenants and come into compliance with

2 Bureaucracies' citations.

3     7.    While the Budget represents the Debtor's best estimate of such expenses, the needs

4 of the business may fluctuate.  Thus, the Debtor seeks authority to deviate from the total expenses

5 contained in the Budget by no more than 15%, on a cumulative basis, and to deviate by category

6 (provided the Debtor does not pay expenses outside any of the categories) without the need for

7 further Court order.

8     8.    The Debtor submits that AMW is adequately protected by the use of cash

9 collateral.  AMW is protected by an equity cushion of approximately 22.6%.  Similarly, Pezeshk

10 is protected by an equity cushion of approximately 21.9% (Debtor understands that Pezeshik

11 consents to use of cash collateral).  In addition, AMW and Pezeshik (collectively,. the "Secured

12 Creditors") will be adequately protected by the continuing management and operation of the

13 Property, thereby preserving the value of their collateral.

14     9.    On the other hand, if the Debtor is not permitted to use its cash collateral to

15 maintain and operate the Property, it is all but certain that the Debtor's existing tenants will

16 leave, taking with them all of the revenue that the Debtor is currently generating.  Furthermore,

17 the Debtor's inability to use cash collateral to operate the Property will make it virtually

18 impossible for the Debtor to enter into any new leases with prospective tenants, thereby

19 foreclosing on the Debtor's ability to generate additional revenue.

20

21 **C.    Compliance With Rule 4001(c) of the Federal Rules of Bankruptcy Procedure And**

22 **Local Bankruptcy Rule 4001-2.**

23     10.    Pursuant to Rule 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure

24 ("Bankruptcy Rules") and Local Bankruptcy Rule 4001-2(b) and (d), the Debtor submits that the

25 relief requested by the Debtor pertaining to the Debtor's use of cash collateral and borrowing of

26 money do not contain any of the following provisions:

27

28

| **Provision** | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |

| **Provision** | |
|---|---|
| Findings of fact on matters extraneous to the approval process. | No |

## II.

## DISCUSSION

**A.    The Debtor Must Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve The Property In Accordance With The Budget.**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C.§ 363(c)(l). A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363. See 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ." 11 U.S.C. §363(a). Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A) each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

See 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-

1    Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614

2    (9th Cir. BAP 1991).   In addition, where the debtor is operating a business, it is extremely

3    important that the access to cash collateral be allowed in order to facilitate the goal of

4    reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash

5    collateral is necessary to operate a business."   In re Dynaco Corporation, 162 B.R. 389 (Bankr.

6    D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

7         The only current source of revenue available to the Debtor to use to maintain and operate

8    the Property is the rent revenue being generated from the lease of units on the Property.  If the

9    Debtor is not permitted to use its cash collateral to maintain and operate the Property, it is all but

10   certain that the Debtor's existing tenants will leave, taking with them all of the revenue that the

11   Debtor is currently generating.   Furthermore, the Debtor's inability to use cash collateral to

12   operate the Property will make it virtually impossible for the Debtor to enter into any new leases

13   with prospective tenants, thereby foreclosing on the Debtor's ability to generate additional

14   revenue.

15        The operating expenses that the Debtor must be able to pay during the pendency of this

16   case are set forth in the Budget.  The Budget reflects the Debtor's ordinary and necessary operating

17   expenses that must be paid postpetition to preserve the Debtor's business.   While the Budget

18   represents the Debtor's best estimate of such expenses, the needs of the business may fluctuate.

19   Thus, the Debtor seeks authority to deviate from the total expenses contained in the Budget by no

20   more than 15%, on a cumulative basis, and to deviate by category (provided the Debtor does not

21   pay expenses outside any of the categories) without the need for further Court order.

22

23   **B.    Secured Creditors Are Adequately Protected.**

24        To the extent that an entity has a valid security interest in the revenues generated by

25   property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy

26   Code.   Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured

27   creditor's cash collateral if the secured creditor is adequately protected.   In re Mellor, 734 F.2d

28

1    1396, 1400 (9th Cir. 1984).  See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In

2    re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

3        Pursuant to the Supreme Court case of United Savings Association v. Timbers of Inwood

4    Forest Associates, 108 S.Ct. 626, 629 (1988) and subsequent case law, the property interest that a

5    debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is

6    only the value of the lien that secures the creditor's claim.  108 S.Ct. at 630.  See also McCombs,

7    Id., at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's

8    claim) to the lesser of the [allowed amount of the] claim or the value of the collateral."

9    McCombs, Id., at 266.

10        In the case of an oversecured creditor, Section 506(a) and Timbers mandate that "there is

11    no lack of adequate protection [even where there is] a decline in collateral value" provided the

12    secured creditor remains oversecured.  McCombs, Id., at 266; In re Chauncy Street Assoc. Ltd.

13    Partnership, 107 B.R. 7, 8 (Bankr. D. Mass 1989).  In this case, the Alleged Secured Creditors

14    are adequately protected by a substantial equity cushion, replacement lien and by the continued

15    operation of the Debtor's business.

16        **1.    AMW (to the extent it is a valid secured creditor) and Pezeshik Will Be**

17        **Adequately Protected by Equity Cushion of Approximately 22.6% and 21.9%,**

18        **Respectively.**

19        As noted above, to the extent that an entity, other than the Debtor, has a valid security

20    interest in the revenues generated by the operation of the Debtor's business, those revenues

21    constitute "cash collateral" under Section 363(a) of the Bankruptcy Code.  11 U.S.C. §363(a).

22    Pursuant to Section 363(c)(2), the Court may authorize the Debtor to use a secured creditor's

23    cash collateral if the secured creditor is adequately protected.  In re Mellor at 1400.  See also In

24    re O'Connor at 1398; In re McCombs at 265.

25        It is well established that the existence of an equity cushion alone can constitute adequate

26    protection to a secured creditor when a debtor seeks to use cash collateral.  In re Mellor, 734

27    F.2d 1396 (9th Cir. 1984).  In Mellor, the Ninth Circuit held that a 20% equity cushion

28    constituted adequate protection as a matter of law.  Id. at 140-01.  The Ninth Circuit indicated

1    that a cushion of less than 20% could also constitute adequate protection and cited with approval

2    decisions holding that equity cushions of between 10% and 20% constituted adequate protection.

3    Id., (citing In re McGowan, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10% cushion

4    is adequate protection); In re Rogers Development Corp., 2 B.R. 679, 685 (Bankr. E. D. Va.

5    1980) (equity cushion of approximately 15% to 20% was adequate protection notwithstanding

6    that the debtors had no equity in the property);  see also, In re Hawaiian Pacific Industries, 17

7    B.R. 670, 673 (Bankr. D. Hawaii 1982) (15% cushion constituted adequate protection).

8            In this case, AMW is owed approximately $1,550,000.00, while the value of the property

9    is approximately $1,900,000.00.  This translates to an equity cushion of approximately 22.6%.

10   As a result, AMW is adequately protected in accordance with the findings of courts in the Ninth

11   Circuit.

12           Similarly, Pezeshik's mechanic's lien, to secure an obligation in the amount of

13   approximately $7,788.00, is junior to that of AMW.  Based on the foregoing, Pezeshik has an

14   equity cushion of 21.9%.  The Debtor understands that Pezeshik does not oppose the Debtor's

15   use of cash collateral.

16

17           **2.        Secured Creditors Will Be Further Adequately Protected by the Continued**

18                       **Operation Of the Debtor's Business.**

19           The preservation of the value of a secured creditor's lien is sufficient to provide adequate

20   protection to a secured creditor when a debtor seeks to use cash collateral.  In re Triplett, 87 B.R.

21   25 (Bankr. W.D.Tex. 1988).  See also In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982).  The Stein

22   Court determined that the use of cash collateral was necessary to the continued operations of the

23   debtor, and that the creditor's secured position could only be enhanced by the continued

24   operation of the debtor's business.  See also, In re McCombs, supra, where the court determined

25   that the debtor's use of cash collateral for needed repairs, renovations and operating expenses

26   eliminated the risk of diminution in the creditor's interest in the cash collateral and such use

27   would more likely increase cash collateral.

28

1    As reflected in the Budget, the Debtor's continued operation and maintenance of the

2    Property will adequately protect the Secured Creditors as the Debtor will continue to generate

3    revenue and preserve the value of the Property.  Other Courts have determined that the Debtor's

4    continued business operations can constitute the adequate protection of a secured creditor.  See

5    Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713 (Bankr. D. Del. 1996); In re Newark

6    Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); In re Dynaco, 162 B.R.

7    389, 394-5 (Bankr. D.N.H. 1993); In re Immenhausen Corp., 164 B.R. 347, 352 (Bankr. M.D.

8    Fla. 1994).

9    Additionally, in determining adequate protection, Courts have stressed the importance of

10   promoting a debtor's reorganization.

11   In In re O'Connor, supra, the Tenth Circuit stated:

12
13   "In this case, Debtors, in the midst of a Chapter ll proceeding, have proposed to
     deal with cash collateral for the purpose of enhancing the prospects of
     reorganization.  This quest is the ultimate goal of Chapter 11.  Hence, the
14   Debtor's efforts are not only to be encouraged, but also their efforts during the
     administration of the proceeding are to be measured in light of that quest.
15   Because the ultimate benefit to be achieved by a successful reorganization
     inures to all the creditors of the estate, a fair opportunity must be given to the
16   Debtors to achieve that end.  Thus, while interests of the secured creditor whose
     property rights are of concern to the court, the interests of all other creditors
17   also have bearing upon the question of whether use of cash collateral shall be
     permitted during the early stages of administration."
18

19   808 F.2d at 1937.

20   The use of cash collateral is critical to the Debtor's ability to implement an effective

21   reorganization strategy for the benefit of all creditors.  As demonstrated herein, the use of the

22   Debtor's cash collateral, in accordance with the Budget, will preserve and maximize the Debtor's

23   assets (in particular, the Property) for the benefit of the estate and all creditors.  If the Debtor is

24   not permitted to use its cash collateral to maintain and operate the Property, the Debtor will not

25   only lose its existing tenants but will be unable to enter into any new lease agreements.  The very

26   source of the Debtor's cash collateral – namely, the rent generated by the lease of units – will

27   evaporate, and the Debtor will be left with only an empty building on the Property.  On the other

28

1   hand, if the Debtor is authorized to use its cash collateral, the Debtor will be able to continue

2   maintaining the Property and generating cash flow so that the Debtor can simultaneously pursue

3   longer term strategies for the restructuring of its financial affairs, including, without limitation,

4   the sale or further lease of units, a combination thereof, or a sale of the Property. Clearly, the use

5   of cash collateral will only enhance the prospect of the Debtor's reorganization.

### III.

### CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that this Court hold a hearing on the

Motion and enter an order:

(1)    affirming the adequacy of the Notice given herein;

(2)    granting the Motion on an interim basis pending a final hearing thereon;

(3)    authorizing the Debtor to use cash collateral to pay all of the expenses set forth in

the Budget, with authority to deviate from the line items contained in the Budget by not more

than 15%, on both a line item and aggregate basis;

(4)    setting a final hearing on the Motion; and

(5)    granting such other and further relief as the Court deems just and proper under the

circumstances.

Dated: April 28, 2010                CEDROS PROPERTIES, LLC

By:___ */s/ David B. Golubchik* _____
                DAVID B. GOLUBCHIK
                JOHN-PATRICK M. FRITZ
                LEVENE, NEALE, BENDER, RANKIN
                 & BRILL L.L.P.
                Proposed Attorneys for Chapter 11
                Debtor and Debtor in Possession

### DECLARATION OF MOUSSA KASHANI

I, MOUSSA KASHANI, hereby declare as follows:

1.     I am over 18 years of age.  I am the Managing Member of San Marino Properties, LLC, the Debtor and Debtor in Possession herein (the "Debtor"), which commenced this case on April 27, 2010 (the "Petition Date").

2.     I have over 25 years of experience, knowledge, and work in the real estate business.  I currently oversee and manage over 650 residential units and two commercial properties, comprising over 24,000 square fee, in California, Nevada, and Texas.  With my knowledge and experience, I have successfully turned troubled real estate properties into profitable, income-producing properties.

3.     I make this declaration in support of the Debtor's emergency motion for use of cash collateral.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto. Unless otherwise stated, all capitalized terms herein have the same meanings as in the accompanying Motion.

## A.    BACKGROUND

4.     The Debtor's primary asset is a 22-unit apartment building (the "Property") located in Panorama City, California.  I caused the Debtor acquired the Property in 2003 for approximately $1,325,000.00 with a promissory note in favor of an entity known as Impact.  In 2007, the promissory note and relevant documents were assigned to Zion Bank.  In 2010, Zion Bank sold and assigned the promissory note on the Property to Asset Management West 14, LLC ("AMW").   The total secured debt on the Property owed to AMW is approximately $1,550,000.00.  There is a secured mechanic's lien in favor of Pezeshk Electric ("Pezeshk") on the Property in the amount $7,788.00.

5.     Based on my experience in owning and operating multi-unit real properties in the Los Angeles area, and my extensive history with the Property, I believe that the Property's value is $1,900,000.00.

6.     Currently, the Property has a certificate of occupancy for eighteen (18) units, and the Debtor is in the process of acquiring a certificate for the full 22 units from municipal agencies with a hearing pending.  For several months the Debtor has been back and forth with the Los Angeles Housing Department and other municipal agencies ("Bureaucracies") regarding regulatory compliance in pursuit of obtaining a certificate of occupancy for the full 22 units in the Property.  Government cutbacks and a pattern of disjointed, bureaucratic, piecemeal citations have stymied the Debtor's efforts and progress in obtaining the certificate.   Typically, Bureaucracies cite the Debtor for a code violation, the Debtor fixes it, then Bureaucracies inspect the Property and cite a new violation.  Each time a violation is cited, the Debtor has addressed it and brought the Property into compliance, and each time Bureaucracies cite another violation that they did not cite before.  This pattern of disjointed citation has delayed the Debtor for months in acquiring the certificate.  The delay has been exasperated further by the municipal budget cutbacks, resulting in less employees to process claims and longer waits on hearings and appeals, like those currently pending for the Debtor.

7.     The ultimate effect of this delay has been a reduction of the Debtor's earning income relative to full occupancy of the Property and generating rental income.  Without the certificate of occupancy, we can rent only eighteen (18) of its 22 units.  Currently, the Debtor is renting approximately sixteen (16) units, for an occupancy rate of 73%.   With lowered occupancy rates, the Debtor was unable to make its monthly loan payments to Zion Bank at approximately $10,000.00 per month, inclusive of principal, interest, and impounded taxes.  We contacted Zion Bank and sought a modification of the loan with Zion Bank until the Debtor could obtain the certificate of occupancy for the remaining four (4) units, but Zion Bank would not negotiate.

8.     In January 2010, Zion Bank filed a notice of default on the Property.   A foreclosure sale would be scheduled for May 2010.  On April 27, 2010, AMW, as the purported

1   assignee of the Zion Bank note, gave notice to the Debtor's proposed bankruptcy counsel and to

2   me that AMW would make an *ex parte* motion for appointment of a state court receiver at 8:30

3   a.m. on April 28, 2010.  It was my understanding that AMW was not interested in a resolution

4   but only foreclosure of the Property.  I determined that the instant filing by the Debtor was

5   necessary and proper to preserve the value of the Property.

6

7   **B.    Need For Use of Cash Collateral**

8        9.    Pursuant to the Motion, the Debtor seeks Court authority to use cash collateral in

9   order to pay the expenses of maintaining and operating the Property, as set forth in the Budget

10  attached hereto as Exhibit "A".  The Budget reflects the Debtor's ordinary and necessary operating

11  expenses that must be paid postpetition to preserve the Debtor's business.  Additionally, the

12  Budget contains a line item for "Capital Expenditures," which are expenditures necessary to

13  rehabilitate vacant units to rent them out to new tenants and come into compliance with

14  Bureaucracies' citations.

15       10.    While the Budget represents my best estimate of such expenses, the needs of the

16  business may fluctuate.  Thus, I hereby seek authority to deviate from the total expenses contained

17  in the Budget by no more than 15%, on a cumulative basis, and to deviate by category (provided

18  the Debtor does not pay expenses outside any of the categories) without the need for further Court

19  order.

20       11.    I believe that there is substantial equity over and above the secured debt on the

21  Property, which protects the secured creditor.  I further believe that continued operation of the

22  Property, without any disruptions, will further protect the secured creditors herein.

23       12.    On the other hand, if the Debtor is not permitted to use its cash collateral to

24  maintain and operate the Property, I believe that it is all but certain that the Debtor's existing

25  tenants will leave, taking with them all of the revenue that the Debtor is currently generating.

26  Furthermore, I believe that the Debtor's inability to use funds to operate the Property will make

27  it virtually impossible for the Debtor to enter into any new leases with prospective tenants,

28  thereby foreclosing on the Debtor's ability to generate additional revenue.

1       I declare under penalty of perjury under the laws of the United States of America that the

2   foregoing is true and correct to the best of my knowledge.

3       Executed on this 29th day of April 2010, at Beverly Hills, California.

4

                           */S/ Moussa Kashani*

5                             MOUSSA KASHANI

# EXHIBIT A

## CEDROS Properties, LLC
## 3 month cash flow estimate

| | Estimated Monthly Income and Expense Numbers | Week 1 1-May to 7-May | Week 2 8-May to 14-May | Week 3 15-May to 21-May | Week 4 22-May to 28-May | Week 5 29-May to 31-May | Weekly Totals | June | July | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|
| Rental Income | 10,200.00 | 5,100.00 | 3,000.00 | 1,100.00 | 1,000.00 | - | 10,200.00 | 10,200.00 | 10,200.00 | 30,600.00 |
| Laundry Income | 215.00 | 215.00 | | | | - | 215.00 | 215.00 | 215.00 | 645.00 |
| **TOTAL INCOME** | 10,415.00 | 5,315.00 | 3,000.00 | 1,100.00 | 1,000.00 | - | 10,415.00 | 10,415.00 | 10,415.00 | 31,245.00 |
| **Repairs & Maintenance** | | | | | | | | | | |
| Fire Safety | 15.00 | 15.00 | | | | | 15.00 | 15.00 | 15.00 | 45.00 |
| Janitorial | 130.00 | 130.00 | | | | | 130.00 | 130.00 | 130.00 | 390.00 |
| Gardening | 100.00 | 100.00 | | | | | 100.00 | 100.00 | 100.00 | 300.00 |
| Pest Control | 40.00 | | 40.00 | | | | 40.00 | 40.00 | 40.00 | 120.00 |
| Repairs & Maintenance Contract | 1,000.00 | 800.00 | | 200.00 | | | 1,000.00 | 1,000.00 | 1,000.00 | 3,000.00 |
| **Total Repairs & Maintenance** | 1,285.00 | 1,045.00 | 40.00 | 200.00 | - | - | 1,285.00 | 1,285.00 | 1,285.00 | 3,855.00 |
| **Taxes, Insurance, & Licenses** | | | | | | | | | | |
| Property Insurance | 430.00 | | 430.00 | | | | 430.00 | 430.00 | 430.00 | 1,290.00 |
| Real Estate Taxes | - | | | | | | - | - | - | - |
| License and Permits | 225.00 | | 225.00 | | | | 225.00 | 225.00 | 225.00 | 675.00 |
| State Taxes | 70.00 | | 70.00 | | | | 70.00 | 70.00 | 70.00 | 210.00 |
| **Total Taxes, Insurance, & Lic.** | 725.00 | - | 725.00 | - | - | - | 725.00 | 725.00 | 725.00 | 2,175.00 |
| **Administrative Expenses** | | | | | | | | | | |
| Management Contract | 550.00 | 550.00 | | | | | 550.00 | 550.00 | 550.00 | 1,650.00 |
| Legal & Professional Fees | 50.00 | | 50.00 | | | | 50.00 | 50.00 | 50.00 | 150.00 |
| Bank Charges | 100.00 | | | | | 100.00 | 100.00 | 100.00 | 100.00 | 300.00 |
| BK11 Accounting | 250.00 | 250.00 | | | | | 250.00 | 250.00 | 250.00 | 750.00 |
| US Trustees Quarterly Fees | 217.00 | | | | 217.00 | | 217.00 | 217.00 | 217.00 | 651.00 |
| **Total Administrative Expense** | 1,167.00 | 800.00 | 50.00 | - | 217.00 | 100.00 | 1,167.00 | 1,167.00 | 1,167.00 | 3,501.00 |
| **Utilities** | | | | | | | | | | |
| Trash Disposal | 100.00 | 100.00 | | | | | 100.00 | 100.00 | 100.00 | 300.00 |
| Gas | 450.00 | 450.00 | | | | | 450.00 | 450.00 | 450.00 | 1,350.00 |
| DWP - Power, Water, Sewer | 1,600.00 | 1,600.00 | | | | | 1,600.00 | 1,600.00 | 1,600.00 | 4,800.00 |
| **Total Utilities** | 2,150.00 | 2,150.00 | - | - | - | - | 2,150.00 | 2,150.00 | 2,150.00 | 6,450.00 |
| **Total Expenses** | 5,327.00 | 3,995.00 | 815.00 | 200.00 | 217.00 | 100.00 | 5,327.00 | 5,327.00 | 5,327.00 | 15,981.00 |
| **Net Ordinary Income** | 5,088.00 | 1,320.00 | 2,185.00 | 900.00 | 783.00 | (100.00) | 5,088.00 | 5,088.00 | 5,088.00 | 15,264.00 |
| **Capital Expenditures** | 4,700.00 | 1,000.00 | 2,000.00 | 900.00 | 800.00 | - | 4,700.00 | 4,700.00 | 4,700.00 | 14,100.00 |
| **Net Income** | 388.00 | 320.00 | 185.00 | - | (17.00) | (100.00) | 388.00 | 388.00 | 388.00 | 1,164.00 |

| | |
|---|---|
| CEDROS PROPERTIES, LLC,<br><div align="right">Debtor(s).</div> | CHAPTER 11<br>CASE NUMBER 2:10-bk-14897-ER |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067

The foregoing document described as **DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF MOUSSA KASHANI IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 29, 2010, I** checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

    * Julian K Bach    Julian@Jbachlaw.com
    * David B Golubchik    dbg@lnbrb.com
    * United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

        ☐   Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:** On **April 29, 2010**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

**VIA OVERNIGHT DELIVERY**
**U.S. TRUSTEE – LOS ANGELES**
**ALL CREDITORS**
**(SEE ATTACHED SERVICE LIST)**

        ☐   Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **April 29, 2010**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

**VIA ATTORNEY MESSENGER DELIVERY**
Hon. Ernest Robles
United States Bankruptcy Court
255 E. Temple Street, Ctrm 1568
Los Angeles, California 90012    ☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| April 29, 2010 | Angela Antonio | /s/ Angela Antonio |
| *Date* | *Type Name* | *Signature* |

1

In re Cedros Properties, LLC
Case No. 1:10-bk-14897-MT
MML

**SERVED VIA OVERNIGHT DELIVERY**

Debtor
Cedros Properties, LLC
c/o Moussa Kashani
445 S. Beverly Drive, Suite 300
PO Box 3770
Beverly Hills, CA 90212-0770

Asset Management West 14, LLC
Attn: Ken Thayer
18831 Von Karman Ave., Suite 380
Irvine, CA 92612

Cardmember Services
PO Box 94014
Palatine, IL 60094-4014

Crown Disposal Co. Inc.
PO Box 1081
Sun Valley, CA 91352

Internal Revenue Service
Insolvency I Stop 5022
300 N. Los Angeles St., #4062
Los Angeles, CA 90012-9903

Moosa Haimof
15300 Ventura Blvd., Suite 218
Sherman Oaks, CA 91403

Smooth Carpet
1010 W. 48th Street
Los Angeles, CA 90037

Debtor's Counsel
David B. Golubchik
Levene, Neale, Bender, Rankin & Brill LLP
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067

Bon Pest Control
12621 Venice Blvd.
Los Angeles, CA 90066

City of LA - Housing Dept
PO Box 30970
Los Angeles, CA 90030-0970

Floor Design
840 S. Robertson Bl.
Los Angeles, CA 90035

Julian Bach, Esq.
17011 Beach Blvd #300
Huntington Beach, CA 92647

Pezeshk Electric
268 N. Cresent Dr. #302
Beverly Hills, CA 90210

The Gas Company
PO Box C
Monterey Park, CA 91756

U.S. Trustee
Ernst & Young Plaza
725 S. Figueroa Street, 26th Floor
Los Angeles, CA 90017

Capital Insurance Group
PO Box 2093
Monterey, CA 93942

City of LA - Office of Finance
PO Box 53200
Los Angeles, CA 90053-0200

Franchise Tax Board
Special Procedures
POB 2952
Sacramento, CA 95812

Los Angeles Dept of Water & Power
PO Box 30808
Los Angeles, CA 90030-0808

Sandoval Carpet Cleaning
8503 Topias Ave # 18
Panorama City, CA 91402